UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOHN SWANIGAN,

        Petitioner,

                                         CASE NO. 2:06-CV-10775

v.                                  JUDGE ROBERT H. CLELAND
                                  MAGISTRATE JUDGE PAUL J. KOMIVES

JERI-ANN SHERRY,

        Respondent.

_____/

**REPORT AND RECOMMENDATION**

*Table of Contents*

I.     RECOMMENDATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
II.    REPORT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
    A.    *Procedural History* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    B.    *Factual Background Underlying Petitioner's Conviction* . . . . . . . . . . . . . . . . . . . . . . . . 5
    C.    *Standard of Review* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
    D.    *Jury Instruction (Claim I)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
        1.    *Procedural Default* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
        2.    *Merit of Petitioner's Claims* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
            a. Unanimity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
            b. Variance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
    E.    *Prosecutorial Misconduct and Admission of Evidence (Claims II, III, & V)* . . . . . . . . . . . . 22
        1.    *Evidentiary and Prosecutorial Misconduct Claims Generally* . . . . . . . . . . . . . . . . . . 23
        2.    *Comment on Petitioner's Silence (Claim II)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
        3.    *Comment on Third Parties' Silence (Claim III)* . . . . . . . . . . . . . . . . . . . . . . . . . . 27
        4.    *Search Warrant Evidence (Claim V)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
    F.    *Sufficiency of the Evidence (Claim IV)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
        1.    *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
        2.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
    G.    *Conclusion* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
III.   NOTICE TO PARTIES REGARDING OBJECTIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

\*      \*      \*      \*      \*

I.     **RECOMMENDATION**: The Court should deny petitioner's application for the writ of

habeas corpus.

II.    **REPORT**:

A.    *Procedural History*

1.      Petitioner John Swanigan is a state prisoner, currently confined at the St. Louis Correctional Facility in St. Louis, Michigan.

2.      On July 17, 2003, petitioner was convicted of possession with intent to deliver 225 or more but less than 650 grams of cocaine, MICH. COMP. LAWS § 333.7401(2)(a)(ii); possession with intent to deliver marijuana, MICH. COMP. LAWS § 333.7401(2)(a)(ii); and possession of a firearm during the commission of a felony, MICH. COMP. LAWS § 750.227b, following a jury trial in the Wayne County Circuit Court.  On July 31, 2003, he was sentenced to a term of 10-30 years' imprisonment on the cocaine conviction, time served (26 days) on the marijuana conviction, and a mandatory consecutive term of two years' imprisonment on the felony-firearm conviction.

3.      Petitioner appealed as of right to the Michigan Court of Appeals raising, through counsel, the following claims:

I.      THE DEFENDANT WAS DENIED A FAIR TRIAL WHERE THE PROSECUTOR INFRINGED THE DEFENDANT'S RIGHT TO REMAIN SILENT WHEN THE PROSECUTION COMMENTED ON THE PRETRIAL SILENCE OF THE DEFENDANT AND THE SILENCE OF THIRD PARTIES.

II.     THE EVIDENCE AT TRIAL, EVEN VIEWED IN A LIGHT MOST FAVORABLE TO THE PROSECUTION, WAS INSUFFICIENT AS A MATTER OF LAW TO PROVE JOHN SWANIGAN CONSTRUCTIVELY POSSESSED THE QUANTITIES OF COCAINE SEIZED FROM THE BASEMENT OF THE HOUSE WHERE THE DEFENDANT WAS ARRESTED.

III.    THE EVIDENCE AT TRIAL, EVEN VIEWED IN A LIGHT MOST FAVORABLE TO THE PROSECUTION, WAS INSUFFICIENT AS A MATTER OF LAW TO PROVE JOHN SWANIGAN CONSTRUCTIVELY POSSESSED THE QUANTITIES OF MARIJUANA SEIZED FROM THE HOUSE WHERE THE DEFENDANT WAS ARRESTED.

IV.     DEFENDANT SWANIGAN'S CONVICTION FOR FELONY-FIREARM SHOULD BE REVERSED BECAUSE THERE WAS INSUFFICIENT EVIDENCE THAT HE POSSESSED A FIREARM.

V.  JOHN SWANIGAN WAS DENIED A FAIR TRIAL, WHERE THE COURT PERMITTED THE PROSECUTOR TO QUALIFY A POLICE OFFICERS [sic] TO TESTIFY AS AN EXPERT ON THE DEFENDANT'S GUILT AS A DRUG DEALER.

VI.  THE PROSECUTION COMMITTED PROSECUTORIAL MISCONDUCT WHEN IT IMPROPERLY INTRODUCED EVIDENCE THAT THE DEFENDANT'S NAME WAS MENTIONED IN THE SEARCH WARRANT AND ARGUED THAT IT WAS SUBSTANTIVE EVIDENCE OF THE DEFENDANT'S GUILT, COMMENTED ON THE DEFENDANT'S PRE-ARREST SILENCE AND LED A POLICE WITNESS TO TESTIFY THAT THE DEFENDANT WAS GUILTY OF DRUG TRAFFICKING.

The court of appeals found no merit to petitioner's claims, and affirmed his conviction and sentence.

*See People v. Swanigan*, No. 250439, 2005 WL 473910 (Mich. Ct. App. Mar. 1, 2005) (per curiam).

Petitioner filed a motion for rehearing in the court of appeals, arguing in connection with the felony-firearm conviction that, not only was the evidence insufficient, but the jury instruction was erroneous and he was denied notice of the charges against him. The court of appeals denied petitioner's motion for rehearing in a standard order. *See People v. Swanigan*, No. 250439 (Mich. Ct. App. Apr. 21, 2005).

4.  Petitioner, through counsel, sought leave to appeal to the Michigan Supreme Court, raising the following claims:

I.  THE COURT OF APPEALS ALLOWED A MANIFEST INJUSTICE TO EXIST WHEN IT REFUSED TO REVERSE THE FELONY FIREARM CONVICTION WHEN THE TRIAL COURT INSTRUCTED THE JURORS THAT THE DEFENDANT COULD BE CONVICTED OF FELONY FIREARM FOR POSSESSION OF ANY FIREARM DURING THE COMMISSION OF THE FELONIES IDENTIFIED BUT THE DEFENDANT WAS CHARGED ONLY WITH POSSESSION OF THE NINE MILLIMETER FIREARM.

II.  THE COURT OF APPEALS ERRED IN RULING THE DEFENDANT'S FIFTH AMENDMENT RIGHT TO REMAIN SILENT WAS NOT VIOLATED WHEN THE PROSECUTOR INTRODUCED EVIDENCE OF

THE DEFENDANT'S PRE- AND POST-ARREST SILENCE IN ITS CASE-IN-CHIEF.

III.     THE COURT OF APPEALS ERRED IN ALLOWING THE PROSECUTION TO USE THE SILENCE OF THIRD PARTIES AS SUBSTANTIVE EVIDENCE OF THE DEFENDANT'S GUILT BECAUSE THE INTRODUCTION OF THIS EVIDENCE VIOLATED THE DEFENDANT'S RIGHTS OF DUE PROCESS AND CONFRONTATION.

IV.     THE COURT OF APPEALS IMPERMISSIBLY PILED AN INFERENCE ON AN INFERENCE IN FINDING THERE WAS SUFFICIENT EVIDENCE TO PROVE THE DEFENDANT CONSTRUCTIVELY POSSESSED COCAINE AND MARIJUANA BECAUSE THERE WAS NO LOGICAL OR FACTUAL BASIS TO SUPPORT THE INFERENCES.

V.      THE COURT OF APPEALS ERRED IN ALLOWING PROSECUTORIAL MISCONDUCT WHEN IT FAILED TO OVERRULE THE PROSECUTION'S IMPROPER INTRODUCTION OF EVIDENCE THAT THE DEFENDANT'S NAME WAS MENTIONED IN THE SEARCH WARRANT AND THAT IT WAS SUBSTANTIVE EVIDENCE OF THE DEFENDANT'S GUILT.

The Supreme Court denied petitioner's application for leave to appeal in a standard order. *See People v. Swanigan*, 474 Mich. 873, 703 N.W.2d 815 (2005).

5.      Petitioner, through counsel, filed this application for the writ of habeas corpus on February 21, 2006.  As grounds for the writ, he raises the five claims that he raised in the Michigan Supreme Court.

6.      Respondent filed a motion to dismiss the petition, arguing that petitioner's first claim was unexhausted.  On January 30, 2007, the Court entered an Order concluding that the claim was not exhausted, but denying respondent's motion to dismiss and instead holding the petition in abeyance pending petitioner's exhaustion of his state court remedies.

7.       Following the Court's Order, petitioner filed a motion for relief from judgment in the trial court pursuant to MICH. CT. R. 6.500-.508, raising the first two claims raised in his petition.

4

On April 19, 2007, the trial court denied the motion pursuant to MICH. CT. R. 6.508(D)(2), concluding that "it appears from a careful examination of the issues presented in defendant's Motion for Relief from Judgment that virtually all of those issues were raised, perhaps with somewhat less specificity in a few cases but nonetheless raised, in his initial appeal to the Michigan Court of Appeals." *People v. Swanigan*, No. 03-3372-01, at 2 (Wayne County, Mich., Cir. Ct. Apr. 19, 2007). Petitioner sought leave to appeal in the Michigan Court of Appeals. The court of appeals denied leave to appeal in a standard order, "for lack of merit in the grounds presented." *People v. Swanigan*, No. 278457 (Mich. Ct. App. July 23, 2007). Petitioner thereafter sought leave to appeal in the Michigan Supreme Court, which denied leave to appeal in a standard order, based on petitioner's "fail[ure] to meet the burden of establishing entitlement to relief under MCR 6.508(D)." *People v. Swanigan*, 480 Mich. 1003, 742 N.W.2d 373 (2007).

8.      Petitioner filed a motion to reopen his case on January 31, 2008. The Court granted the motion on March 4, 2008, and ordered respondent to file an answer to the petition.

9.      Respondent filed his answer on September 2, 2008. He contends that petitioner's sufficiency of the evidence claim is without merit, and that petitioner's remaining claims are both procedurally defaulted and without merit.

10.     Petitioner filed a reply to respondent's answer on September 15, 2008.

B.      *Factual Background Underlying Petitioner's Conviction*

Petitioner's conviction stems from a search conducted on February 11, 2003, at a home owned by him. The evidence adduced at trial was accurately summarized in petitioner's brief in the Michigan Court of Appeals:

> The first witness called by the prosecution was Officer Eric Woodall - Redford Township Police Officer (5yrs/Special Investigation Bureau dealing with

5

drug trafficking/narcotics investigation) (V I p 143) He testified he was given a [sic] prior to the execution of the search warrant (V I p 145) He was the ram, meaning he was the primary one making entry into the house by knocking, announcing and ramming the doors.  (V I p 145) He said he arrived at 20400 Winston (located in the City of Detroit) on February 11, 2003.  It was nighttime.  He did not recall the exact time.  (V I p 147) After being shown a copy of the police report to refresh his memory, he recalled the time as being 2200.  (V I p 148) He was equipped with raid gear, a mask, a hat indicating "police", as well as a shirt that indicated "police."  (V I p 149)

He indicated that he was at the side door of the Winston address.  (V I p 150) It was well lit.  (P 151) He further indicated that there were several parked cars on the street as well as a couple in the driveway.  This was a residential neighborhood.  (V I p 152) Upon entering the residence, he noticed that there was a closed circuit TV inside the residence.  It was clear the exterior was being monitored.  (V I p 152)

Officers were at the front door knocking and announcing.  They could hear people yelling (not talking).  No one came to the door.  The door was a steel framed door.  Shadows could be seen of people running up the steps and throughout the living area.  (V I p 154) There were no visual observations that could be made, just hearing footsteps.  (V I p 155) Officers Meade, Deprima Jones and Supervisor Lieutenant McLeay were behind Officer Woodall.  (V I p 156)

Upon entering the residence, Officer Woodall held the door for the other officers.  Some residents went upstairs and were chased by police officers.  There were few people in the living area, and Officer Woodall went downstairs.  (V I p 157) There was a small area in the steps that went up to the right.  In the living area there was a very large TV (approximately 50 inches) that they were watching that had a video game playing.  (V I p 158)

The police officers tried to secure all the people inside the residence.  They had one TV on and were playing a video game.  Next to the TV was another TV, that had closed-circuit monitoring for the outside of the residence.  (V I p 159) Officer Woodall observed that it was cut into quarters monitoring the outside of the house and front door, as well as other areas of the house.  (V I p 160)

The officers tried securing all occupants of the residence.  There were a couple of individuals in the living room.  (V I p 160) Office Woodall assisted other officers, but did not talk with anyone.  There was an evidence person who was assisting in gathering evidence with one individual documenting and tagging evidence.  (V I p 161-162) Once the house was secured, the officers tried to make a common area (the living area) to get peoples' names, etc.  Officer Woodall never came in contact with John Swanigan.  (V I p 162)

Another officer took control of John Swanigan at the time the residence was secured.  (V I p 162) Other than John Swanigan there were approximately six other individuals present in the home.  (V I p 163) The defense objected to hearsay statements of third persons.  The prosecution asked whether anyone suggested that they were a renter at the residence.  (V I p 165) The prosecution also asked about how crack cocaine is packaged.  The witness answered, it can be packaged the same

as powder cocaine.  They can be packaged in various types and sizes of Ziploc bags.
(V I p 168)

The witness indicated it took about three minutes from the time that the
police knocked and announced to the time he entered the house.  (V I p 170-171) It
took a long time to enter the premises because the door was very sturdy.  He thought
he heard footsteps.  (V I p 171) He did not see anyone going up the stairs.  (V I p
171)  Upon gaining entry into the house, the officers went up the stairs to see if there
were people upstairs.  As it turned out there was only one person upstairs.  (V I p
172)

He could not identify the person he heard going up the stairs.  He saw Officer
Jones escorting Mr. Swanigan from the hallway.  They came up from the steps.  The
only place Mr. Swanigan came from was the steps; there was no other place to go.
(V I p 173) He did not see anyone coming up the steps.  (V I p 173)

James Meade was the next witness called by the prosecution; he was also a
Redford Township Police Officer.  (V I p 175) His duty was to use the halogen.  That
is a metal bar used on some houses that have the steel screen doors, security doors.
The bar was used to pry the door open.  (V I p 177) He observed a security gate on
the door when he entered.  He went to the front door.  (V I p 180-181) He heard
talking, people could be heard yelling loudly.  Footsteps could be heard.  A shadow
could be seen of someone running up the stairs.  (V I p 182)

He was the first person inside the residence.  Upon entry into the house,
Woodall was concerned about the person running upstairs.  He ran directly up the
stairs.  There was someone up there.  (V I p 184) He seized a subject named Dujuan
Thomas.  (V I p 184) Crack cocaine was taken from Mr. Thomas.  A couple of
baggies were in his front pocket.  Mr. Thomas was then taken into custody.  (V I p
185) He did not have identification on him.  (V I p 186) Someone was found hiding
in the basement.  (V I p 187) There was a canine officer present that evening.
Officer Kevin Jeziorowski was using his canine to search the residence.  (V I p 188)

On cross-examination, Officer Meade stated he saw some shadows running
up the stairs as well as hearing some noise that was consistent with someone running
up the stairs.  (V I p 190) Officer Meade found an individual hiding between the wall
and the bed.  (V I p 191) Officer Meade made no documentation of anything found
in the dresser drawers of the residence, but there was nothing illegal in the drawers.
(V I p 192) Dujuan Thomas was pulled from underneath the bed and put in
handcuffs.  Thirteen bags of suspected crack cocaine were found on his person.
After this seizure, Mr. Thomas was brought downstairs.  (V I p 193).

Officer Meade then went into the basement area after the police gathered
everyone they could find into the living room.  (V I p 194) After this assemblage,
Officer Meade found Shawn Williams hiding in the basement.  Shawn Williams was
also placed under arrest.  (V I p 194) Officer Woodall noticed Mr. Williams hiding
behind the furnace.  (V I p 195) There were seven people in the house that were
taken into custody.  (V I p 197) The basement of the house was under construction
and there was no dry wall on some of the walls.  (V I p 200) Shawn Williams was
found in the basement <u>after</u> the canine officer entered the residence.  (V I p 201)

Shawn Williams was discovered in the basement approximately 10 to 20 minutes after the police entered the premises. (V I p 202)

The third prosecution witness was John Butler who was a police officer for the Township of Redford for 7 yrs. In the month of February, 2003, he was assigned to uniform patrol. (V II p 10) On February 11, 2003, he was to provide the presence of a uniformed officer as they served a search warrant at 20400 Winston. (V II p 11) There was a briefing held in the basement of the police department regarding the search warrant. (V II p 11) His duties were to provide a uniform presence, assist with transporting any prisoners should anyone be arrested and to assist the entry team as rear guard securing persons inside. He was not wearing a raid uniform. He followed the raid van in the patrol van. (V II p 12) Officer Butler assisted in securing various subjects that were in the house in the living room. Some evidence was observed at that time. (V II p 13)

After the announcement of "Police" "Search Warrant," sounds could be heard like someone running through the house (at least one person). Some cameras were noticed upon approaching the house. (V II p 14) The prosecution again asked if anyone inside the house responded saying come in or can we assist you officers. The officer said, "no." (V II p 15) Force was attempted for quite some time since the door was very sturdy. (V II p 16) Officer Butler was number 5 or 6 from the front line of entry. (V II p 17) Someone announced "secure" once everyone was brought into the living room. (V II p 17) There were seven people brought into the living room area. (V II p 18)

The witness identified the defendant as the man who was brought to the living room. The witness indicated Mr. Swanigan was not there when he initially entered the residence. (V II p 19) Officer Butler was uncertain as to what they were supposed to be looking for. He just assisted the team with the raid. (V II p 20) Officer Butler did observe a large plastic bag containing a green leafy material on the speaker shelf that appeared to be marijuana, a couple of small scales and a cell phone. (V II p 20)

There were other pieces of furniture in the living room, a couch and a Lazy Boy chair and table. (V II p 22) Officer Butler did not gather the evidence, he just pointed it out to Officer Jones. (V II p 24) Office Butler indicated that the amount of marijuana found was a medium sum. (V II p 25) Officer Butler indicated that a Nokia cell phone and extended capacity 9 millimeter magazine, which was fully loaded with 9 millimeter ammunition, two scales were also pointed out to Officer Jones and taken into custody. (V II p 26) Officer Butler said the magazine appeared to be fully loaded but he could not see without unloading and counting the rounds. (V II p 27) There was a black Taurus handgun sitting on the table. (V II p 29) The gun was taken into custody for safety reasons. (V II p 29) He believed the 9 millimeter black handgun was sitting on the arm of the Lazy Boy, sitting on the left arm rest. (V II p 30) After taking the gun into custody, he rendered it safe and turned it over to Officer Jones in person. (V II p 31)

The witness also saw what appeared to be marijuana. (V II p 34) It was found in the Havana Joe canvass bag in the northwest corner of the living room on

the floor.  (V II p 34) Officer Butler looked in the canvas bag and observed two large plastic bags.  One contained a green leafy material, which appeared to be marijuana. The other container contained four smaller bags inside the larger bag that also contained apparent marijuana.  (V II p 35) Officer Butler believed there were six, maybe seven officers were at the scene.  (V II p 41) On cross-examination, Officer Butler testified he stayed in the living room the entire time.  (V II p 50) Within seven to ten minutes someone on the raid team told him the house was secure.  (V II p 50).

The next prosecution witness was Kevin Jeziorowski, a Redford Police Officer.  (V II p 59) He was assigned to a canine unit.  (V II p 60) He had received special training with his dog, Czar.  (V II p 61) His dog had been trained to find narcotics.  (V II p 62) Officer Jesiorowski's job was to go to the back to make sure no one runs out the back door or back window.  He secured the back and waited for the all clear to bring the dog in when it was safe.  (V II p 63) Upon entering the house he was told to start downstairs.  (V II p 67) His dog was off its leash on this particular occasion.  (V II p 67) There was a room on the southeast corner of the basement; it was like a laundry room.  He had to check the doorway there prior to sending him in.  (V II p 68) The dog's head went up showing interest.  (V II p 69)

The interest was in the room w[h]ere a blue rubber maid container was found. (V II p 72) While he was scratching, he moved a couple of items and he found a gun lying on top of a black plastic bag.  The gun was not deep into the rubber maid bin. (V II p 72) The bin was a foot and a half or so high, 2 to 3 feet wide.  (V II p 73) Underneath that there was a black plastic bag, a grocery bag, which the dog seemed to want to get at.  (V II p 73) The gun was taken out and secured.  There was someone found in the basement area.  (V II p 74) Before they got down there he looked in the black plastic bag and found several chunks of an off-white substance, suspected to be crack cocaine.  He had his canine out of the room as Officer Woodall was checking the room when found the subject in back by the furnace.  (V II p 75) The handgun found was a black 40 caliber Ruger, semiautomatic pistol.  (V II p 77) The gun and the crack cocaine in the bin were found 10 to 15 feet from where the black male was hiding in the furnace room.  (V II p 86)

The last prosecution witness was Brian Jones of the Redford Township Police Department.  (V II p 96) He mentioned that Mr. Swanigan was named in the warrant. (V II p 100) He testified that there is a dollar affixed to the gram weight of cocaine by the type of dealer.  (V II p 104) He stated a price that could range from $50 to $60, depends on the dealer.  (V II p 104) He stated he distinguished simple possession of narcotics versus the delivery or attempted delivery of narcotics by the quantity of narcotics.  (V II p 115) Based on the amount of marijuana observed, the officer concluded it to be for delivery.  (V II p 116) He came in contact with John Swanigan.  (V II p 117) He was coming up from the basement, towards the middle of the stairs, he was walking up the stairs.  (V II p 118) The blue bin was in the laundry room in its own separate room.  (V II p 121) Mr. Swanigan was approximately 15 feet away.  (V II p 122) Shawn Williams was discovered on the side of the furnace.  (V II p 123)  Some other marijuana was found in a large black coat with a fur hood.  (V II p 124)  A Sprint cell phone bill to John Swanigan was

9

found with the house address on a table in the living room. (V II p 125) The invoice pay period on the bill was January 5th through February 4th. (V II p 126) No utility bills belonging to anybody were found there that evening. (V II p 127) The office secured a warrant deed that indicated ownership by Mr. John Swanigan, a single man, was identified. (V II p 128)

Dujuan Thomas was found upstairs. Monty Brown and William Williams were found in the northeast bedroom. (V II p 129) Shawn Williams was found in the basement in the furnace area. (V II p 130) Connie Wilson and Terry Thomas were found in the southeast bedroom. (P130) Shawn Williams was found around 20 minutes later than the rest of the individuals. (V II p 132) The state police forensic division lab reported 408.9 grams of cocaine was contained in the analysis. The report also came back showing positive for marijuana. (V II p 134) The baggies and narcotics were sent for fingerprint analysis. The results were negative on the guns. (V II p 136) There was a pre-raid surveillance done at this house. He never saw anyone go inside the house. (V II p 142) He never saw John Swanigan going in that house. (V II p 144) All seven people in that house were placed under arrest for possession with attempt to deliver marijuana and cocaine. (V II p 172) He did not find any keys on Mr. Swanigan to the premises. (V II p 173-174) He never saw Mr. Swanigan in possession of any guns or drugs. (V II p 174)

[The defense moved for a directed, which was denied.]

The prosecution then called Detective Sergeant Mary Dempsey Knox. (V III p 4) She was employed with the Northville forensic laboratory and assigned to the latent fingerprint unit. She was qualified as an expert. (V III p 5) She received several clear plastic baggies. Some of them had been knotted. (V III p 11) She did not find any fingerprints on the baggies. (V III p 16) She did not find anything of identifiable value on those baggies. (V III p 16) She did not analyze any handguns in this particular case. (V III p 17)

The defense recalled Officer Jones to the stand. (V III p 18) He indicated there were two bedrooms on the first floor. (V III p 21) Terry Thomas and Connie Andrews were in the southeast bedroom laying on the bed. (V III p 23) In the northeast bedroom there were also two people. (V III p 23) When he went up upstairs he found there was a bedroom. (V III p 29)

He indicated there was evidence that was collected. Based on his observations and the collection of evidence, the only evidence that was in open view, meaning that was in open view to the officer was some marijuana and the gun that was on the armchair. (V III p 31) All the other evidence was in some way concealed. (V III p 31-32) The only marijuana this witness saw that was in open view, plain view, meaning visible without taking it out of bags. The marijuana was in the living room and a weapon that was on the Lazy Boy chair. (V III p 32) He did not notice an order when he first went into that living room. (V III p 34)

Latonya Sharee Hill testified that she lived in Sterling Heights, MI. She lived with her two children, ages 11 and 5, and John Swanigan. (V II p 37) John Swanigan is the father of her children. She moved into the apartment in December 2002. On July 18, 2000 she moved into a home at 20400 Winston Street, Detroit, Michigan (V

10

III p 38) There were iron doors on the house at the time.  She moved on Winston Street in July 2002 with John Swanigan and her two children.  (V III p 39) Someone broke into her home in November 2002 and robbed them.  There was more than one person who robbed them.  Her children were at home.  She called the police (V III p 40) A police report was taken.  (V III p 41) Her home was robbed on November 22, 2002.  She remained in the house for one day after the robbery and then moved with her grandmother and cousin.  Mr. Swanigan stayed with his mother and sister.  There was a lease signed by John and Latonya.  (V III p 43) Latonya Hill did not take any of the children's toys or furniture in the house when she moved.  (V III p 44) When she moved to Sterling Heights John Swanigan lived with her and signed the lease.  She moved to Sterling Heights because she felt comfortable and had family there.  Ms. Hill and Mr. Swanigan still had to make the mortgage payments on the Winston property.  (V III p 45) John rented the house on Winston but Ms. Hill did not know to whom.  (V III p 46) John works at Head of Joy on Joy Road and usually comes home around 8:30 p.m.  He did not come home the night of February 11th.  (V III p 47) Ms. Hill has never been married to Mr. Swanigan.  (V III p 49) Ms. Hill had a relationship and lived with Mr. Swanigan for 13 years.  He is the father of her children.  He never lived in Minnesota or California.  (V III p 50) He lived on Harlow street in Detroit.  (V III p 51) Ms. Hill had never seek the deed to the property on Winston.  (V III p 52) There was no reason why her name was not on the ownership of the property and Ms. Hill was aware th[at] Mr. Swanigan had sole ownership of the property.  They both wrote checks to pay bills.  (V III p 53) After the November 22nd incident Ms. Hill received $14,000 from the insurance company to recoup her loss.  (V III p 54) Ms. Hill claims neither she nor her husband [sic] bought a .40 caliber handgun.  She does not know what a .40 caliber handgun looks like.  (V III p 56) She knew there were handguns at the Winston property.  They were kept locked in a container in the closet.  (V III p 57) Ms. Hill did not know if the gun shown to her by counsel was the same gun that was found in the Winston address on February 11th.  (V III p 59) She went back to the house on Winston once after the robbery after the security doors were put up.  She felt it necessary to put surveillance cameras on the outside of the perimeter of the house.  (V III p 60) She did not feel secure once the surveillance cameras and door were put up and they decided to look for another place.  (V III p 62)

They rented the property on Winston for $950 a couple of weeks after they moved out.  The rental checks were not being sent to her address in Sterling Heights.  (V III p 66) Ms. Hill also lived on Braile Street in Detroit, Penrod in Detroit within the last five years.  (V III p 67) The majority of the time Mr. Swanigan never lived with her at those addresses.  Ms. Hill was not aware that Mr. Swanigan used other names.  He was also known as Anthony Johnson, John Johnson, and John Swanigan.  (V III p 68) Mr. Swanigan lived on Harlow Street, Winston Street and 1981 Pasadena Street in the City of Detroit.  He did not live on Dolphin Street in the City of Detroit.  He did not live on Virginia Street or in California.

She came back to the Winston address about the beginning of December and at that time all the special equipment was affixed to the house.  The laundry room

11

was in the basement of the house and the children's toys were also kept in the basement.  In the photographs Defense Exhibit O it was not the way it appeared when she was living there.  (V III p 72) There was some remodeling being done. The photographs were taken at a time when things were moved.  (V III p 73)

The mortgage on the Winston property and Sterling Heights property totaled $1,700 not including utilities.  (V III p 74) Ms. Hill did not know who rented the house.  She did not have anything to do with it because she was still shaken up and wasn't involved.  (V III p 75) She did not know what arrangements were made or how payment was received.  (V III p 76)

Ms. Hill knew Erica Swanigan.  She lived in California.  She was in the armed forces.  She is John Swanigan's sister.  (V III p 77) Mr. Swanigan did not live in California.  (V III p 78)

* * * *

Angela Denise Swanigan-Bostic testified she was married to Kevin Bostic. (V III p 94) She worked for the U.S. Postal Service.  Her husband worked for Daimler Chrysler.  Her brother is John Swanigan.  Her brother purchased a house on Winston Street in Detroit in July.  Her other brother gave John Swanigan a gift to finance his home.  (V III p 95) He gave Mr. Swanigan the money to put the down payment on the house. . . .  (V III p 96) He lived with his girlfriend and two children on Winston Street.  There was a home invasion in November.  She was at the house before the invasion happened on that day. (pg. 97) Her husband and she changed the locks and put the armor guard doors and put in an alarm system.  They also put some cameras for the kids.  They needed to feel secure so she tried to make them feel comfortable.  The iron guard doors were not on the house before the invasion.  (V III p 98) She paid for the guardian alarm system.  (V III p 99) She entered into the contract on 11/30.  She has the bill for the security cameras and a charge card receipt. The cameras were purchased on 12/4.  (V III p 100) She presented the receipt when she changed the locks on the main doors.  Her brother and his girlfriend moved out the same day.  (V III p 101) They moved to Sterling Heights.  She has been at the house in Sterling Heights.  Her husband and she assisted them with making both payments.  (V III p 102) She wrote a check.  After the doors and alarm system and the other security system were installed, her brother and Latonya returned to live at the Winston address.  (V III p 103) They stayed in the house a couple of days.  (V III p 104) Her mother lives on Harlow Street.  Her brother lived with his mother immediately after the invasion.  (V III p 106) Her brother had handguns in the house on Winston Street.  (V III p 108) She never saw the guns.  (V III p 109).

Def.-Appellant's Br. on Appeal, in *People v. Swanigan*, No. 250439 (Mich. Ct. App.), at 1-12.

C.    *Standard of Review*

Because petitioner's application was filed after April 24, 1996, his petition is governed by

the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No.

12

104-132, 110 Stat. 1214 (Apr. 24, 1996). *See Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997).

Amongst other amendments, the AEDPA amended the substantive standards for granting habeas

relief by providing:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"[T]he 'contrary to' and 'unreasonable application' clauses [have] independent meaning."

*Williams v. Taylor*, 529 U.S. 362, 405 (2000); *see also*, *Bell v. Cone*, 535 U.S. 685, 694 (2002). "A

state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts

the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are

materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a

result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam)

(quoting *Williams*, 529 U.S. at 405-06); *see also*, *Early v. Packer*, 537 U.S. 3, 8 (2002); *Bell*, 535

U.S. at 694. "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court

to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme]

Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*,

539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also*, *Bell*, 535 U.S. at 694.

However, "[i]n order for a federal court to find a state court's application of [Supreme Court]

precedent 'unreasonable,' the state court's decision must have been more than incorrect or

erroneous.  The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also*, *Williams*, 529 U.S. at 409.

By its terms, § 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with "clearly established federal law as determined by the Supreme Court."  Thus, "§ 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence."  *Williams*, 529 U.S. at 412.  Further, the "phrase 'refers to the holdings, as opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court decision.'  In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003) (citations omitted) (quoting *Williams*, 529 U.S. at 412).

Although "clearly established Federal law as determined by the Supreme Court" is the benchmark for habeas review of a state court decision, the standard set forth in § 2254(d) "does not require citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early*, 537 U.S. at 8; *see also*, *Mitchell*, 540 U.S. at 16.  Further, although the requirements of "clearly established law" are to be determined solely by the holdings of the Supreme Court, the decisions of lower federal courts are useful in assessing the reasonableness of the state court's resolution of an issue.  *See Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003); *Phoenix v. Matesanz*, 233 F.3d 77, 83 n.3 (1st Cir. 2000); *Dickens v. Jones*, 203 F. Supp.2d 354, 359 (E.D. Mich. 2002) (Tarnow, J.).

D.      *Jury Instruction (Claim I)*

Petitioner first contends that he was denied a fair trial because the court instructed the jury that it could find petitioner guilty of possessing a firearm if it found that he possessed any of the firearms found in the house, even though he was only charged with possessing the 9mm firearm found on a chair in the living room.  Specifically, the information charged that petitioner "did carry or have in his/her possession a firearm, to-wit: 9MM, at the time he/she committed or attempted to commit a felony . . . ."  The trial court instructed the jury that, to find petitioner guilty of the firearm offense, it must find both that petitioner committed the crime of possession with intent to deliver marijuana or cocaine, and "that at the time the [petitioner] committed or attempted to commit those crimes he knowingly carried or possessed *a* firearm."  Trial Tr., Vol. IV, at 26 (emphasis added).  Petitioner argues that, because three firearms were found at the house but the information only charged him with possession of one particular firearm, the court's instruction both resulted in an unconstitutional variance and allowed him to be convicted on a less than unanimous verdict.  The Court should conclude that petitioner is not entitled to habeas relief on this claim because it is procedurally defaulted, and in any event the claim is without merit.

      1.    *Procedural Default*

Under the procedural default doctrine, a federal habeas court will not review a question of federal law if the state court's decision rests on a substantive or procedural state law ground that is independent of the federal question and is adequate to support the judgment.  *See Coleman v. Thompson*, 501 U.S. 722, 729 (1991).  Here, petitioner first raised his jury instruction claim in his motion for reconsideration in the Michigan Court of Appeals, and then again in his application for leave to appeal in the Michigan Supreme Court.  In staying petitioner's case, this Court has already determined that the presentation of petitioner's jury instruction claim in this fashion did not

15

constitute "fair presentation" of the claim sufficient to render it exhausted. When he returned to the state courts, the trial court rejected petitioner's claims because, for the most part, they had already been raised on direct appeal and thus were barred by Rule 6.508(D)(2), and to the extent that they were not raised petitioner had failed to establish good cause for his failure to do so as required by Rule 6.508(D)(3). The appellate courts denied petitioner's subsequent applications for leave to appeal on the basis of petitioner's "failure to meet the burden of establishing entitlement to relief under MCR 6.508(D)."

To the extent that the trial court rejected petitioner's claim on the basis of Rule 6.508(D)(3) based on his failure to raise the claim on direct appeal, the claim is procedurally defaulted. To the extent that the trial court relied on Rule 6.508(D)(2), its reliance would not constitute an invocation of a procedural bar because this rule establishes merely a *res judicata* rule. Here, however, it is clear that Rule 6.508(D)(3) applies. Although the trial court did not clearly delineate between the claims that were barred by Rule 6.508(D)(2) because they had already been decided on direct appeal, and those that were barred by Rule 6.508(D)(3) because they had not been raised, a reading of state law compels the conclusion that petitioner's jury instruction claim was rejected on the later basis. Under Michigan law a denial of leave to appeal by that court is merely a discretionary decision to decline to hear a case, and thus does not constitute a ruling on the merits of any claims raised in the application. *See Valentino v. Oakland County Sheriff*, 424 Mich. 310, 322 n. 8; 381 N.W. 2d 397 (1986). Therefore, a denial of leave to appeal by the Michigan Supreme Court has no *res judicata* or law of the case effect. *See Grievance Admin. v. Lopatin*, 462 Mich. 235, 260; 612 N.W.2d 120 (2000). Rule 6.508(D)(2) does not bar post-conviction review of claims that were raised for the first time in a direct appeal to the Michigan Supreme Court where the Supreme Court has denied the

application for leave to appeal, because "a denial of leave to appeal by the Supreme Court, without explanation, is generally not considered a decision on the merits and is not precedentially binding." *See Lamb v. Jones,* No. 2005 WL 1378762, * 2-3 (E.D. Mich. June 2, 2005) (citing *People v. Shook*, No. 233346, 2002 WL 31379664, * 2 (Mich.Ct. App. Oct. 22, 2002)).  Petitioner's presentation of the claim in his motion for rehearing and application for leave to appeal did not render the claim properly raised or actually decided by the Michigan courts so as to make Rule 6.508(D)(2) applicable. *Cf. People v. Carter*, 477 Mich. 998, 998, 726 N.W.2d 1, 1 (2007) (Kelly, J., dissenting from denial of leave to appeal); *Shook*, 2002 WL 31379664, at *2.  In short, petitioner failed to present his jury instruction claim in a procedurally proper fashion on direct appeal, and the trial court denied petitioner relief on this claim based on his inability to establish good cause for his failure to do so.      Accordingly, the Court should conclude that the jury instruction claim is procedurally defaulted.

When the state courts rely on a valid state procedural bar, federal habeas review is also barred unless petitioner can demonstrate "cause" for the default and actual prejudice as a result of the alleged constitutional violation, or can demonstrate that failure to consider the claim will result in a "fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750-51 (1991).  If a petitioner fails to show cause for his procedural default, it is unnecessary for the court to reach the prejudice issue. *Smith v. Murray*, 477 U.S. 527, 533 (1986).  However, in an extraordinary case, where a constitutional error has probably resulted in the conviction of one who is actually innocent, a federal court may consider the constitutional claims presented even in the absence of a showing of cause for procedural default. *Murray v. Carrier*, 477 U.S. 478, 479-80 (1986).  However, to be credible, such a claim of innocence requires a petitioner to support the allegations of constitutional

17

error with new reliable evidence that was not presented at trial. *Schlup v. Delo*, 513 U.S. 298, 324 (1995).  Actual innocence, which would permit collateral review of a procedurally defaulted claim, means factual innocence, not mere legal insufficiency. *Bousley v. United States*, 523 U.S. 614, 623 (1998).

Here, petitioner has failed to assert any cause for his failure to properly raise his jury instruction claim on direct appeal.  Nor has petitioner pointed to any new, reliable evidence showing that he is factually innocent of the crimes for which he was convicted.  Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on his jury instruction claim.

2.      *Merit of Petitioner's Claims*

Even if the Court rejects the procedural default analysis above, the Court should nevertheless conclude that petitioner is not entitled to habeas relief because his claim is without merit.

*a. Unanimity*

Petitioner first contends that the jury instruction denied him a fair trial because it allowed the jury to convict him on the felony-firearm charge without reaching a unanimous verdict with respect to which particular firearm he possessed.  The Court should conclude that petitioner is not entitled to habeas relief on this claim.

First, there is no constitutional right to a unanimous verdict in a state criminal trial.  The Sixth Amendment provides, in relevant part, that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district in wherein the crime shall have been committed[.]" U.S. CONST. amend. VI.  Although this provision has been interpreted as requiring jury unanimity in federal prosecutions, this requirement has not been applied to the states through the Due Process Clause of the Fourteenth Amendment.  Thus, as a general

18

matter, there is no constitutional requirement that a state criminal jury reach a unanimous verdict, *see Schad v. Arizona*, 501 U.S. 624, 630 (1991) (plurality opinion); *Brown v. Louisiana*, 447 U.S. 323, 330-31 (1980); *Apodaca v. Oregon*, 406 U.S. 404, 410-11 (1972) (plurality opinion),[1] and a jury unanimity claim, standing alone, will therefore afford no basis for habeas relief, *see Carlyle v. Rowland*, No. 91-55385, 1992 WL 122254, at *1 (9th Cir. June 3, 1992).

Second, in *Richardson v. United States*, 526 U.S. 813 (1999), "the Supreme Court distinguished between the elements of a crime, which it held had to be determined unanimously, and the means by which an element may be accomplished, which does not require unanimity." *United States v. Davis*, 306 F.3d 398, 413 (6th Cir. 2002) (discussing *Richardson*, 526 U.S. at 817); *see also*, *Schad v. Arizona*, 501 U.S. 624, 632-45 (1991) (plurality opinion). Here, the felony-firearm charge could be satisfied by the possession of any gun, and thus the court's instruction did not deprive petitioner of his right to a unanimous verdict. *Cf. Coe v. Bell*, 161 F.3d 320, 348 (6th Cir. 1998) (citing *Schad* for the proposition that "it is acceptable for a first-degree murder conviction to be based on two alternative theories even if there is no basis to conclude which one (if only one) the jury used."); *United States v. DeJohn*, 368 F.3d 533, 542 (6th Cir. 2004) (under federal firearm possession statute, jury need not be instructed that it must unanimously find possession of a particular firearm). Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

### b. Variance

Petitioner also argues that the instruction resulted in a variance which deprived him of notice

---

[1]In certain situations a state criminal defendant may have a constitutional due process right to a unanimous verdict, such as where he is tried before a six-person jury. *See Brown*, 447 U.S. at 331. However, these circumstances are not present here.

of the charges against him.  The Sixth Amendment provides, in relevant part, that a criminal

defendant has the right to "be informed of the nature and cause of the accusation" against him.

U.S. CONST. amend VI.  Notice and an opportunity to defend against the charges as guaranteed

by the Sixth Amendment are an integral part of the due process protected by the Fourteenth

Amendment, and are accordingly applicable in state prosecutions.  *See Cole v. Arkansas*, 333 U.S.

196, 201 (1948); *In re Oliver*, 333 U.S. 257, 273 (1948).  The complaint or indictment challenged

need not be perfect under state law so long as it adequately informs the petitioner of the crime in

sufficient detail so as to enable him to prepare a defense.  Thus, "[a]n indictment which fairly but

imperfectly informs the accused of the offense for which he is to be tried does not give rise to a

constitutional issue cognizable in habeas proceedings."  *Mira v. Marshall*, 806 F.2d 636, 639 (6th

Cir. 1986); *see also*, *United States v. Buckley*, 689 F.2d 893, 899 (9th Cir. 1982); *Ransom v. Davis*,

613 F. Supp. 430, 431 (M.D. Tenn. 1984), *aff'd*, 767 F.2d 921 (6th Cir. 1985).  "[A] charge is

sufficiently specific when it contains the elements of the crime, permits the accused to plead and

prepare a defense, and allows the disposition to be used as a bar in a subsequent prosecution."

*Fawcett v. Bablitch*, 962 F.2d 617, 618 (7th Cir. 1992).

The Sixth Circuit has recently explained how modification of a charging document is to

be analyzed:

> We have recognized two categories of indictment modification:
>> An amendment of the indictment occurs when the charging terms
>> of the indictment are altered, either literally or in effect, by
>> prosecutor or court after the grand jury has last passed upon them.
>> A variance occurs when the charging terms of an indictment are left
>> unaltered, but the evidence offered at trial proves facts materially
>> different from those alleged in the indictment.
> [*United States v.*] *Nance*, 481 F.3d [882,] 886 [(6th Cir. 2007)] (citations and
> internal quotation marks omitted). . . .
>> Because they implicate different constitutional concerns, we scrutinize

amendments and variances differently. "An amendment is per se prejudicial, as it directly infringes the defendant's right to know of the charges against him by effectively allowing the jury to convict the defendant of a different crime than that for which he was charged." *Martin v. Kassulke*, 970 F.2d 1539, 1542 (6th Cir .1992). "A variance is not reversible error unless the defendant demonstrates prejudice." *Nance*, 481 F.3d at 886. However, the line separating an amendment from a variance is blurry: "If a variance infringes too greatly upon the defendant's Sixth Amendment right to be informed of the nature and cause of the accusation against him, then it is considered a constructive amendment and is accorded the per se prejudicial treatment of an amendment." *Id.* (citation and internal quotation marks omitted). A variance becomes a constructive amendment "only when the variance creates a substantial likelihood that a defendant may have been convicted of an offense other than that charged by the grand jury." *Id.* (citations and internal quotation marks omitted). This may occur when "the presentation of evidence and jury instructions . . . modify essential elements of the offense charged[,]" *United States v. Robison*, 904 F.2d 365, 369 (6th Cir.1990) (citations and internal quotation marks omitted), or when "the difference between the indictment and the jury instructions allowed the defendant to be convicted on the basis of different behavior than that alleged in the original indictment." *United States v. Garcia-Paz*, 282 F.3d 1212, 1216 (9th Cir.2002).

*United States v. Beasley*, ___ F.3d ___, ___, 2009 WL 3211799, at *3 (6th Cir. Oct. 8, 2009).

Here, the trial court's instruction amounted, at most, to a variance, and not to a constructive amendment. Neither the evidence presented nor the court's instruction modified the essential elements of the crimes charged nor allowed petitioner to be convicted on the basis of behavior different than that charged in the information. The particular gun or type of gun possessed was not an element of the felony-firearm charge against petitioner, and the information charged behavior–possession of a firearm during the commission of a drug felony–regardless of which particular gun petitioner possessed. *See Beasley*, ___ F.3d at ___, 2009 WL 3211799, at *4; *Robison*, 904 F.2d at 369. Thus, petitioner is entitled to relief only if he shows that he was prejudiced by the variance.

Here, petitioner cannot show that he was prejudiced by the variance between the information and the court's instruction. As the Sixth Circuit explained, "[a] variance is not material, or does not

21

rise to the level of a constructive amendment, unless the variance misleads the accused in making her defense or exposes her to the danger of double jeopardy." *Martin*, 970 F.2d at 1543.  Although the information specifically referred to a "9MM" gun, it did not otherwise identify the particular gun used.  It was clear to all parties from the outset that three guns had been recovered in the house, and that all were alleged by the prosecutor to have been possessed during the drug trafficking crime. The prosecutor's and petitioner's theory of the case did not focus on any particular gun, as evidenced by the parties' closing arguments.  The prosecutor's theory was that petitioner was running a drug operation out of the house and was, at a minimum, responsible for all the guns and drugs found in the house as an aider and abettor, while petitioner argued that he never possessed the drugs or guns and was not involved in any drug activity, but had merely rented the house to others and was present at the time of the police entry solely for the purpose of collecting rent.  *See* Trial Tr., Vol. III, at 135-74.  It is difficult to discern how the parties' presentations and in particular petitioner's defense would have differed in any way had the information specifically charged possession of all three guns (or no specific gun at all), or in light of the parties' positions how the jury would have reached a different verdict on the gun charge had it been specifically instructed to consider only whether petitioner possessed the 9mm handgun found in the living room.  *See Robison*, 904 F.2d at 369; *cf. United States v. Rodriguez*, 525 F.3d 85, 105 (1st Cir. 2008) (variance between persons defendant was alleged to have conspired with to possess handgun and actual persons established at a trial not prejudicial in light of evidence presented and theories of the case). Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

E.      *Prosecutorial Misconduct and Admission of Evidence (Claims II, III, & V)*

Petitioner next raises several claims challenging the admission of evidence and related

22

comments by the prosecutor.  Specifically, petitioner contends that he was denied a fair trial and various constitutional rights by: (1) the introduction of his pre-arrest silence and related prosecutorial argument based on this silence; (2) the introduction of third parties' silence and related prosecutorial comments; and (3) the introduction of evidence that his name was listed on the search warrant and related prosecutorial comments.  The Court should conclude that petitioner is not entitled to habeas relief on these claims.

1.     *Evidentiary and Prosecutorial Misconduct Claims Generally*

It is well established that habeas corpus is not available to remedy a state court's error in the application of state law.  *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("Today, we reemphasize that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."); *Jackson v. Ylst*, 921 F.2d 882, 885 (9th Cir. 1990) (a federal court on habeas review "ha[s] no authority to review a state's application of its own laws).  Thus, unless a violation of a state's evidentiary rule results in the denial of fundamental fairness, an issue concerning the admissibility of evidence does not rise to the level of a constitutional magnitude.  *See Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir. 1988); *Davis v. Jabe*, 824 F.2d 483, 487 (6th Cir. 1987).  "[A] federal habeas court has nothing whatsoever to do with reviewing a state court ruling on the admissibility of evidence under state law.  State evidentiary law simply has no effect on [a court's] review of the constitutionality of a trial, unless it is asserted that the state law itself violates the Constitution."  *Pemberton v. Collins*, 991 F.2d 1218, 1223 (5th Cir. 1993).  As the Sixth Circuit has noted, "[e]rrors by a state court in the admission of evidence are not cognizable in habeas proceedings unless they so perniciously affect the prosecution of a criminal case as to deny the defendant the fundamental right to a fair trial."  *Kelly v. Withrow*, 25 F.3d 363, 370 (6th Cir.

23

1994).  In short, "[o]nly when the evidentiary ruling impinges on a specific constitutional protection or is so prejudicial that it amounts to a denial of due process may a federal court grant a habeas corpus remedy." *Barrett v. Acevedo*, 169 F.3d 1155, 1163 (8th Cir. 1999); *see also*, *Coleman v. Mitchell*, 244 F.3d 533, 542 (6th Cir. 2001).  Where a specific constitutional right–such as the right to confront witnesses or to present a defense–is not implicated, federal habeas relief is available only if the allegedly erroneously admitted evidence "is almost totally unreliable and . . . the factfinder and the adversary system will not be competent to uncover, recognize, and take due account of its shortcomings." *Barefoot v. Estelle*, 463 U.S. 880, 899 (1983).

Similarly, for habeas relief to be warranted on the basis of prosecutorial misconduct it is not enough that the prosecutor's conduct was "undesirable or even universally condemned." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986).  Rather, the misconduct must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id*. (internal quotation omitted).  "[T]he touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982).  In determining whether the prosecutor's conduct was so egregious as to warrant habeas relief, a court should consider "the degree to which the remarks complained of have a tendency to mislead the jury and to prejudice the accused; whether they are isolated or extensive; whether they were deliberately or accidentally placed before the jury; and the strength of the competent proof to establish the guilt of the accused." *Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir. 1997) (internal quotations and citations omitted). In sum, to constitute a denial of due process the prosecutor's conduct must be "so pronounced and persistent that it permeates the entire atmosphere of the trial." *Id*. (internal quotation omitted). Further, a prosecutor does not commit misconduct by introducing admissible evidence or

24

commenting on evidence admitted in the course of the trial during argument. *See Sweet v. Delo*, 125 F.3d 1144, 1154 (8th Cir. 1997); *Hammond v. Michigan Parole Bd.*, No. 04-73385, 2006 WL 2161028, at *16 (E.D. Mich. July 31, 2006) (Roberts, J., adopting Recommendation of Komives, M.J.).

      2.    *Comment on Petitioner's Silence (Claim II)*

Petitioner first contends that he was denied a fair trial and his Fifth Amendment privilege against self-incrimination when the prosecutor elicited evidence and commented on his pre-arrest silence. During the examination of the police officers who had conducted the raid, the prosecutor asked whether anybody inside the house answered the door, asked the police why they were there, or offered assistance. Each officer testified that no occupant had done so. *See* Trial Tr., Vol. I, at 154, 160-61, 183; Vol. II, at 15-16. During closing argument the prosecutor suggested that this evidence, along with other evidence, showed that petitioner's house was a drug house and that the occupants, including petitioner, were attempting to hide the drugs when the police arrived. *See id.* Vol. III, at 144. Petitioner contends that this comment and the evidence elicited from the officers constituted an impermissible comment on his invocation of his right to remain silent. The Michigan Court of Appeals, reviewing the claim for plain error because of petitioner's failure to object at trial, disagreed, concluding that petitioner's right to remain silent was not implicated because "the referenced silence did not pertain to defendant remaining silent in the face of police interrogation or his invoking of his right to remain silent in reliance on *Miranda*." *Swanigan*, 2005 WL 473910, at *1, slip op. at 1-2. The Court should conclude that petitioner is not entitled to habeas relief on this claim because the Michigan Court of Appeals's conclusion that the *Griffin* rule does not apply to pre-arrest silence was neither contrary to nor an unreasonable application of clearly established

Supreme Court precedent.[2]

The Fifth Amendment provides, in relevant part, that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself[.]" U.S. CONST. amend. V. This provision applies to the states via the Due Process Clause of the Fourteenth Amendment. *Malloy v. Hogan*, 378 U.S. 1, 6 (1964). The Supreme Court has determined that this provision "forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." *Griffin v. California*, 380 U.S. 609, 615 (1965). Likewise, "it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." *Doyle v. Ohio*, 426 U.S. 610, 618 (1976). Nevertheless, the Court's subsequent cases have made clear that *Griffin* and *Doyle* are limited to situations in which the defendant's silence was induced by the governmental assurances embodied in the *Miranda* warnings. *See Fletcher v. Weir*, 455 U.S. 603, 606 (1982) (per curiam) (post-arrest statements made before *Miranda* warnings are given may be commented upon by prosecutor, noting that the Court has "consistently explained *Doyle* as a case where the government had induced silence by implicitly assuring the defendant that his silence would not be used against him."); *Jenkins v. Anderson*, 447 U.S. 231, 240 (1980) (pre-arrest silence may be used for impeachment because "no governmental action induced [the defendant] to remain silent before arrest.").

It is true that several courts of appeals, including the Sixth Circuit, have held that it violates

---

[2]At the outset, it is doubtful whether the Fifth Amendment is implicated at all by the police officer testimony and the prosecutor's argument. The primary import of the challenged testimony and comments related not to petitioner's silence but to his failure to open the door for the police, demonstrating, in the prosecutor's view, that petitioner was not merely present to collect rent but was a participant in the drug activities occurring in the house. Nothing in the Fifth Amendment or the Supreme Court's cases interpreting that provision suggests that evidence of a defendant's relevant conduct or inaction violates the privilege against self-incrimination. For the reasons discussed below, however, the Court need not resolve petitioner's claim on this basis.

the Fifth Amendment to use a defendant's pre-arrest silence as substantive evidence of guilt.  *See*

*Combs v. Coyle*, 205 F.3d 269, 283 (6th Cir. 2003).  However, this is a question on which the courts

are equally divided, *see id*. at 282, and, more importantly for purposes of § 2254(d)(1), the Supreme

Court has never held that the use as substantive evidence of a defendant's pre-arrest silence not

induced by the *Miranda* warnings violates the Fifth Amendment.  On the contrary, the Court in

*Jenkins* explicitly declined to "consider whether or under what circumstances prearrest silence may

be protected by the Fifth Amendment."  *Jenkins*, 447 U.S. at 236 n.2; *see also*, *Portuondo v. Agard*,

529 U.S. 61, 70 (2000) (noting *Jenkins* Court's observation that "it was not clear whether the Fifth

Amendment protects pre-arrest silence.").   As the Supreme Court has explained on several

occasions, "it is not an unreasonable application of clearly established Federal law for a state court

to decline to apply a specific legal rule that has not been squarely established by this Court."

*Knowles v. Mirzayance*, 129 S. Ct. 1411, 1419 (2009) (internal quotation omitted); *accord Wright*

*v. Van Patten*, 128 S. Ct. 743, 747 (2008).  Thus,

> [t]he Supreme Court's failure to rule on this issue, coupled with the "disagreement and confusion" among the federal courts concerning the resolution of this issue, precludes this court from finding that the Michigan Court of Appeals' decision was an unreasonable application of clearly established federal law, where clearly established Supreme Court precedent on the issue of using prearrest silence as substantive evidence of guilt did not, and does not, exist.

*Mitchell v. Lafler*, No. 02-CV-74805, 2003 WL 21817616, at *4 (E.D. Mich. July 10, 2003) (Cohn,

J.) (citing *Worden v. McLemore*, 200 F. Supp. 2d 746, 752-53 (E.D.Mich.2002)), *aff'd*, 118 Fed.

Appx. 24, 27 (6th Cir. 2004); *see also*, *Jones v. Trombley*, 307 Fed. Appx. 931, 934 (6th Cir. 2009).

Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

3.    *Comment on Third Parties' Silence (Claim III)*

Petitioner next argues that he was denied a fair trial and the right to confront the witnesses

27

by the prosecutor's introduction of the same evidence with respect to the other people arrested in the home, namely, evidence that none of them answered the door or asked why the police were there or whether they could be of assistance. This claim fails for several reasons.

First, the claim is procedurally defaulted for the same reason that petitioner's jury instruction claim is defaulted. In his initial court of appeals brief, petitioner presented this claim solely as one of state evidentiary law, arguing that the evidence was not admissible under the hearsay rules and was irrelevant. Petitioner did not assert that the admission of this evidence violated his constitutional right to confront the witnesses. Indeed, unlike petitioner's jury instruction claim, this claim was not even raised in petitioner's motion for rehearing in the court of appeals, but was raised for the first time in petitioner's application for leave to appeal in the Michigan Supreme Court. Thus, for the reasons explained above in connection with petitioner's jury instruction claim, petitioner's confrontation claim is barred by petitioner's procedural default.

Second, petitioner cannot show a Confrontation Clause violation. The Sixth Amendment provides, in relevant part: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI. The Confrontation Clause is applicable to the states through the Fourteenth Amendment's Due Process Clause. *See Pointer v. Texas*, 480 U.S. 400, 406 (1965). In *Crawford v. Washington*, 541 U.S. 36 (2004), the Supreme Court concluded that, under a proper understanding of the Clause, "[t]estimonial statements of witnesses absent from trial have been admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." *Crawford*, 541 U.S. at 59. Thus, "[w]here testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation." *Id.*

28

at 68-69.   In *Crawford*, the Supreme Court left "for another day any effort to spell out a comprehensive definition of 'testimonial.'" *Crawford*, 541 U.S. at 68.  The Court did, however, provide some guidance.  Specifically, the Court provided three possible "formulations of th[e] core class of 'testimonial' statements":

> [1] *ex parte* in-court testimony or its functional equivalent–that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially; [2] extrajudicial statements contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions; [and] [3] statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.

*Id*. at 51-52 (internal quotations and citations omitted).  While the Court declined to adopt any of these three formulations, the Court noted that the term "testimonial," whatever else it may cover, "applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations."  *Crawford*, 541 U.S. at 68.

In *Crawford*, the Court suggested, but did not definitively rule, that the Confrontation Clause is limited to regulating the introduction of testimonial hearsay, and has no application at all to the admission at trial of non-testimonial hearsay.  The Court explained that "[w]here nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law–as does *Roberts*, and as would an approach that exempted all such statements from Confrontation Clause scrutiny altogether."  *Crawford*, 541 U.S. at 68. Following *Crawford*, the Supreme Court has since clarified that the Confrontation Clause is simply not implicated by the introduction of non-testimonial hearsay.  In *Davis v. Washington*, 547 U.S. 813 (2006), the Court explicitly addressed this question of "whether the Confrontation Clause applies only to testimonial hearsay."  *Id*. at 823.  The Court noted that the answer to this question was

suggested in *Crawford*, when the *Crawford* decision explained that the Confrontation Clause focuses on "witnesses" who give "testimony." *Id.* at 823-24 (discussing *Crawford*, 541 U.S. at 51). The *Davis* Court explained that "[a] limitation so clearly reflected in the text of the constitutional provision must fairly be said to mark out not merely its 'core,' but its perimeter." *Id.* at 824 Thus, where nontestimonial hearsay is at issue, the Confrontation Clause is not implicated at all, and need not be considered. *See Whorton v. Bockting*, 549 U.S. 406, 420 (2007) ("Under *Roberts*, an out-of-court nontestimonial statement not subject to prior cross-examination could not be admitted without a judicial determination regarding reliability. Under *Crawford*, on the other hand, the Confrontation Clause has no application to such statements and therefore permits their admission even if they lack indicia of reliability."); *United States v. Pugh*, 273 Fed. Appx. 449, 454 (6th Cir. 2008); *United States v. Feliz*, 467 F.3d 227, 231 (2d Cir. 2006).

Turning to petitioner's claim, it is clear that none of the police officer testimony about the conduct of the occupants of the house amounts to testimonial hearsay under *Crawford*. The officers' own observations do not involve any out of court "testimony" by "witnesses," but merely constitute "straight-forward eyewitness testimony." *United States v. Marshall*, 259 Fed. Appx. 855, 861 (7th Cir. 2008). The occupants' failure to answer the door or ask the officers why they were there do not constitute "testimony" under the Confrontation Clause because they do not assert anything. Under the hearsay rules, "[a] 'statement' is (1) an oral or written assertion or (2) nonverbal conduct of a person if it is intended by the person as an assertion." FED. R. EVID. 801(a); *see United States v. Washington*, 498 F.3d 225, 230 (4th Cir. 2007) ("[W]hile the hearsay rules of the Federal Rules of Evidence do not formally demarcate the scope of 'statements' for Confrontation Clause purposes, we take [the Rule 801(a) definition of 'statement'] to be uncontroversial."); *United States v. Flores*,

286 Fed. Appx. 206, 213 (5th Cir. 2008).  The testimony of the officers did not relate any oral or written assertions of the occupants of the house, nor did it reflect any nonverbal conduct that was intended by the occupants to assert anything.  As the Court explained in *Crawford*, the Confrontation Clause is concerned only with "'witnesses' against the accused–in other words, those who 'bear testimony.'" *Crawford*, 541 U.S. at 51.  Because the occupants did not intend to assert anything by their actions or inactions in response to the police raid, the police officers' testimony describing those actions and inactions "in no way involves a witness bearing testimony."  *United States v. Lopez-Moreno*, 420 F.3d 420, 436 (5th Cir. 2005); *see also*, *Flores*, 286 Fed. Appx. at 214 ("Mata's actions were neither a declaration nor an affirmation and do not resemble a witness bearing testimony.").  Thus, there was no Confrontation Clause violation, and petitioner is not entitled to habeas relief on this claim.

### 4. *Search Warrant Evidence (Claim V)*

Petitioner next argues that he was denied a fair trial by the introduction of evidence that his name was listed on the search warrant and by related prosecutorial comments regarding this fact. *See* Trial Tr., Vol. II, at 100, 116; Vol. III, at 147-48, 171.  The Michigan Court of Appeals concluded that petitioner was not entitled to habeas relief on this claim because he "presented no case law to support his assertion that the prosecutor's mention of the accurate fact that his name was on the search warrant constituted misconduct." *Swanigan*, 2005 WL 473910, at *6, slip op. at 7.  The court also concluded that relief was not warranted because, even if there was error, petitioner could not demonstrate prejudice.  The court reasoned that "[i]t was undisputed that defendant owned the house," and that "police witnesses testified that the house was under surveillance before the search warrant was issued, and that defendant was not observed during any of the surveillance." *Id*.  Thus,

the court concluded "the evidence that defendant's name was on the search warrant for a house that he owned was inconsequential," particularly in light of the trial court's instructions regarding the presumption of innocence and the burden of proof. *Id*. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

Even assuming that the introduction of this evidence was improper, petitioner cannot show that the evidence and the prosecutor's comments were sufficiently prejudicial to have denied him a fair trial. To establish a due process violation, petitioner "must prove that the asserted error was so conspicuously prejudicial or of such magnitude that it fatally infected the trial and deprived him of fundamental fairness." *Manning-El v. Wyrick*, 738 F.2d 321, 323 (8th Cir. 1984); *see also*, *Schoenberger v. Russell*, 290 F.3d 831, 835 (6th Cir. 2002) ("[O]nly in extraordinary cases will an error in the application of state rules of evidence rise to the level of a due process violation in a federal habeas proceeding."). There was no dispute that petitioner owned the home, and there was likewise no dispute that the officers had not observed petitioner during their surveillance of the home. The jury would not likely have viewed the fact that petitioner was named in the warrant as of particular significance in light of the fact that it was undisputed that he owned the home. Further, the court instructed the jury that petitioner was presumed innocent, that the prosecution bore the burden of proving petitioner's guilt beyond a reasonable doubt, and that the comments of counsel were not evidence. In these circumstances, petitioner cannot show that this is "one of the 'extraordinary cases' in which 'an error in the application of state rules of evidence r[o]se to the level of a due process violation.'" *Foster v. Ludwick*, 208 F. Supp. 2d 750, 760 (E.D. Mich. 2002 (Rosen, J.) (quoting *Schoenberger*, 290 F.3d at 836). Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

32

F.      *Sufficiency of the Evidence (Claim IV)*

Petitioner next challenges the sufficiency of the evidence supporting his drug possession convictions. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

1.      *Clearly Established Law*

The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In Re Winship*, 397 U.S. 358, 364 (1970). Under the pre-AEDPA standard for habeas review of sufficiency of the evidence challenges, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). Reviewing courts must view the evidence, draw inferences and resolve conflicting inferences from the record in favor of the prosecution. *See Neal v. Morris*, 972 F.2d 675, 678 (6th Cir. 1992). In determining the sufficiency of the evidence, the court must give circumstantial evidence the same weight as direct evidence. *See United States v. Farley*, 2 F.3d 645, 650 (6th Cir. 1993).

However, under the amended version § 2254(d)(1) a federal habeas court must apply a more deferential standard of review of the state court decision. Thus, the question here is whether the Michigan Court of Appeals's application of the *Jackson* standard was reasonable. *See Gomez v. Acevedo*, 106 F.3d 192, 198-200 (7th Cir. 1997), *vacated on other grounds sub nom. Gomez v. DeTella*, 522 U.S. 801 (1998); *Restrepo v. DiPaolo*, 1 F. Supp. 2d 103, 106 (D. Mass 1998).

While a challenge to the sufficiency of the evidence on an established element of an offense raises a federal constitutional claim cognizable in a habeas corpus proceeding, *see Jackson*, 443 U.S.

at 324, "[t]he applicability of the reasonable doubt standard . . . has always been dependent on how a State defines the offense that is charged in any given case." *Patterson v. New York*, 432 U.S. 197, 211 n.12 (1977); *see also*, *Jackson*, 443 U.S. at 324 n.16; *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975). Thus, "[a] federal court must look to state law to determine the elements of the crime." *Quartararo v. Hanslmaier*, 186 F.3d 91, 97 (2d Cir. 1999).

2.      *Analysis*

Petitioner contends that the evidence was insufficient to show that he possessed any of the drugs found in the house because there was no evidence that he was in the vicinity of any of the drugs found in the house or of whether the drugs were located prior to the police entry. He contends that, because there was no evidence that he ever had contact with any of the individuals in the house, there is nothing to connect him to the drugs found in the house besides his mere presence, which is insufficient. The Michigan Court of Appeals rejected petitioner's claim, reasoning:

> The evidence, if believed, supported an inference that defendant used the house as a drug house, that he had constructive possession of the controlled substances in the house, and that he hid a large amount of cocaine in the basement as the police were knocking on the door. There was undisputed evidence that defendant owned the house, and defendant was present at 10:00 p.m. when the search warrant was executed. Additionally, a phone bill addressed to defendant at the residence was found in the house, and defendant's driver's license showed his address at the residence. There was also undisputed evidence that the elaborate security system on this modest house was installed on defendant's behalf. Although defendant claimed that he was at the house only to collect rent, no documentation of rental agreements or rental payments was produced. Furthermore, testimony revealed that neither defendant, nor anyone else in the house, responded during the two to three minutes that the police continuously rammed the front door, or approached any officer inside the house. Rather, as the police were knocking, they heard yelling and footsteps, and saw shadows of people running throughout the living area.
>
> There was evidence that, when the police entered the house, a large television with a video game was playing next to the closed circuit television showing the exterior of the home. The smell of marijuana was apparent inside the house. In the living room, an officer immediately observed, in plain view, a large, clear plastic bag containing marijuana, two small scales, a cellular telephone, a loaded,

34

nine-millimeter magazine on the entertainment center, and a loaded nine-millimeter handgun on the arm of a chair. In the corner, the police found a canvas bag that contained a large plastic bag of loose marijuana, a second large plastic bag containing four smaller bags of marijuana, and various packaging materials. An officer found defendant coming upstairs from the basement, where the police found a Rubbermaid container that contained more than 408 grams of cocaine and a forty-caliber firearm.

From this evidence, a jury could reasonably infer that defendant hid the cocaine and the firearm in the basement as the police were attempting to gain entry to search the house. Additionally, given that a large amount of marijuana was in plain view, a jury could reasonably infer that defendant had constructive possession of that marijuana, as well as the marijuana in the canvas bag that was in the same room. Furthermore, although the drugs could have belonged to other people in the house, possession may be joint.

*Swanigan*, 2005 WL 473910, at *3, slip op. at 3-4.  The Court should conclude that this determination was reasonable.

Under Michigan law, a person need not have actual physical possession of a drug or firearm to be convicted of a possession offense.  Rather, it is sufficient that he have constructive possession, meaning the ability to exercise dominion and control over the drugs.  *See People v. Johnson*, 466 Mich. 491, 500, 647 N.W.2d 480, 486 (2002); *People v. Wolfe*, 440 Mich. 508, 519-20, 489 N.W.2d 748, 753 (1992).  In petitioner's case the evidence, when viewed in the light most favorable to the prosecution, was sufficient to establish petitioner's constructive possession of the cocaine, marijuana, and guns recovered in the house.  The undisputed evidence showed that the house was owned by petitioner.  Contrary to his argument that the house was rented out and he was there merely to obtain payment of rent, there were indicia of petitioner's residence in the house including the address listed on his driver's licence, a phone bill in his name at the house's address, and the lack of any documentation of a lease or rental payments.  The evidence also showed that the drugs and guns were found either in hidden locations inside the house in places accessible to petitioner, or in open view.  Further, although petitioner claimed to have done so because of a robbery, it was

35

undisputed that petitioner had installed the security measures at the home, and that the police officers testified these security measures were consistent with drug houses. From this evidence, a reasonable juror could conclude beyond a reasonable doubt that petitioner had at least constructive possession of the drugs and guns found in the house. *See United States v. Richardson*, 208 F.3d 626, 632 (7th Cir. 2000); *United States v. Jenkins*, 175 F.3d 1208, 1216 (10th Cir. 1999); *United States v. McCracken*, 110 F.3d 535, 541 (8th Cir. 1997). This evidence was buttressed by the discovery of petitioner by the police on the stairs leading from the basement, where the cocaine and a handgun had been secreted.

This conclusion is not altered by the fact that others in the home equally may have possessed the drugs and guns. First, as the court of appeals noted, possession may be joint. Second, the fact that the evidence may have supported another version of events is irrelevant; the prosecution's evidence need not rule out every hypothesis other than petitioner's guilt to be sufficient. *See Jackson*, 443 U.S. at 326. Because of this, and because possession need not be exclusive, the fact that others had access to the house does not render the evidence insufficient to establish petitioner's possession beyond a reasonable doubt. *See United States v. Gibbs*, 182 F.3d 408, 425 (6th Cir. 1999); *cf. United States v. Patterson*, 295 Fed. Appx. 100, 101-02 (8th Cir. 2008). Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

G.    *Conclusion*

In view of the foregoing, the Court should conclude that the state courts' resolution of petitioner's claims did not result in a decision which was contrary to, or which involved an unreasonable application of, clearly established federal law. Accordingly, the Court should deny petitioner's application for the writ of habeas corpus.

36

III.      NOTICE TO PARTIES REGARDING OBJECTIONS:

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Secretary of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Federation of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Any objections must be labeled as "Objection #1," "Objection #2," etc.  Any objection must recite *precisely* the provision of this Report and Recommendation to which it pertains.  Not later than ten days after service of an objection, the opposing party must file a concise response proportionate to the objections in length and complexity.  The response must specifically address each issue raised in the objections, in the same order and labeled as "Response to Objection #1," "Response to Objection #2," etc.


                                                    s/Paul J. Komives


        PAUL J. KOMIVES

        UNITED STATES MAGISTRATE
JUDGE
Dated: 10/26/09

| The undersigned certifies that a copy of the foregoing order was served on the attorneys of record by electronic means or U.S. Mail on October 26, 2009. |
| --- |
| s/Eddrey Butts |
| Case Manager |